**UNITED OSSINING PARTY et al.,**
**Plaintiffs,**

v.

**Albert T. HAYDUK and William J.**
**Van Wart, Defendants.**

**No. 71 Civ. 3849.**

United States District Court,
S. D. New York.

Sept. 27, 1971.

Nov. 1, 1971.

On Application For Modification
Nov. 1, 1971.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs; Martin London and Lewis A. Kaplan, New York City, of counsel.

John J. S. Mead, County Atty., White Plains, N. Y., for defendants; John J. Sherlock, Sr., Asst. County Atty., Cono J. Ioppolo, Asst. County Atty., of counsel.

Louis J. Lefkowitz, Atty. Gen., of New York, for intervenor State of New York; New York City, Samuel A. Hirshowitz, First Asst. Atty. Gen., Harvey E. Soicher, Asst. Atty. Gen., of counsel.

Before MANSFIELD, Circuit Judge, and WYATT, and POLLACK, District Judges.

MANSFIELD, Circuit Judge:

Under attack in this action is the recently enacted amendment of the New York Election Law, § 138–b, Chapter 1179 of the Laws of New York 1971, which became effective on July 6, 1971. It places certain restrictions on cross-endorsements of candidates for public office, i. e., the nomination and appearance on the ballot of a person as a candidate of both (1) a political party and (2) an independent group or body. The Election Law, § 2, defines a "party" as "any political organization which at the last preceding election for governor polled at least fifty thousand votes for governor." An "independent body" (which is used interchangeably with the term "independent group" in § 138–b) is defined as "any organization or group of voters which, by independent certificate, nominates a candidate or candidates for office to be voted for at an election at which official ballots are used, and which is not a party." The amendment, Chapter 1179, provides that no candidate for an office other than a judicial or statewide office shall be eligible to receive the nomination and to appear on the ballot as the candidate of both a political party and an independent group or body.[1]

The principal plaintiffs are an independent body (United Ossining Party ("UOP")), a political party (Ossining Democratic Village Committee, or ODVC, a subdivision of the New York State Democratic Party) and two persons nominated by them for election on November 2, 1971, to the office of Trustee of the Village of Ossining, Thomas Appleby and George J. Behling, Jr.[2]

---

1. New York Election Law § 138–b was amended by Chapter 1179 of the Laws of New York 1971 to add the following pertinent subsections:

"§ 138–b. *Limitation on right to receive independent or party nomination*

"1. Any candidate who has received and accepted the nomination of a party, for an office other than judicial or statewide shall not be eligible to receive the nomination of any independent group for the same office for the same year.

"2. Any candidate who has received and accepted the nomination of an independent group shall not be eligible to receive the nomination of a party, for an office other than judicial or statewide for the same office for the same year."

2. Additional plaintiffs are the Chairman of the ODVC (Yvette Murphy), Chairman of the UOP (David Kornreich), and a registered Republican in Ossining (Hattie V. Dunlap), who wishes to vote for Appleby and Behling in the forthcoming election without supporting the Democratic Party.

Defendants are the Commissioners of the Westchester County Board of Elections (who are charged with enforcement of the Election Law, N.Y. Election Law art. 3), and the State of New York, which was permitted to intervene pursuant to Rule 24(b), F.R.Civ.P. Plaintiffs seek a judgment declaring Ch. 1179 unconstitutional and in violation of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c (Supp.1971) and injunctive relief, preliminary and permanent, barring enforcement of Ch. 1179 to prevent the two plaintiff-candidates, Appleby and Behling, from appearing on both the UOP and Democratic Party (ODVC) lines of the ballot to be used in the election scheduled for November 2, 1971. Federal jurisdiction is invoked pursuant to the federal Civil Rights Act, 42 U.S.C. § 1983, 28 U.S.C. § 1343, and §§ 5, 12 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, 1973j.

This three-judge court was convened by order of Acting Chief Judge Smith on September 7, 1971. On September 16, 1971, after reviewing the papers and memoranda submitted by the parties and hearing oral argument, we issued a temporary restraining order, pending our decision on plaintiffs' application for preliminary injunctive relief. For the reasons hereafter stated, preliminary injunctive relief is granted.

The essential background facts are as follows:

On November 2, 1971, the voters of Ossining, an incorporated village in Westchester County, New York, will by election fill two vacancies on its five-man Board of Trustees. Experience in the 1970 Ossining election indicates that candidates will be nominated by three "parties" within the meaning of the New York Election Law, the Republican Party, the Democratic Party (ODVC), and the Conservative Party, and by an independent body, the UOP. The latter does not meet the statutory definition of a political party because it has not offered candidates for election to governor or other statewide offices or, for that matter, to offices outside of Ossining. In 1970 the UOP nominated for the offices of Mayor and Trustee candidates who were also nominated by the Democratic Party (ODVC), and the names of these candidates appeared on the ballot row or line of both. The votes cast on each of the two rows or lines for each candidate, when combined, were sufficient to defeat the opposing candidates, who were endorsed by both the Republican and Conservative Parties. None of the winning candidates, however, received more votes on the UOP line alone, or on the Democratic line alone, than the combined total of votes cast for their opponents on the two lines of the Republican and Conservative Parties. Thus the UOP, by virtue of its cross-endorsement of candidates who were also nominated by the Democratic Party, proved to be a vital force in the election.

In the upcoming November 1971 election, the UOP and the Democratic Party have followed their earlier strategy by nominating Appleby and Behling for the two vacancies on the Board. On September 20, 1971, there was filed with the Westchester County Board of Elections (1) petitions nominating them as UOP candidates, (2) a certificate of the Democratic Party (ODVC) nominating them as its candidates, and (3) their certificates accepting both nominations. (See Affidavit of Lewis A. Kaplan, dated September 20, 1971). Defendants, however, have advised that, unless restrained by court order, they plan to enforce Chapter 1179, thus rendering Appleby and Behling ineligible to appear on the ballot rows or lines of both the Democratic Party and the UOP. The law would permit them to appear on either ballot line, but not on both. If their opponents, on the other hand, receive the nomination of the Republican and Conservative Parties, their names will, under the statute as amended, be permitted to appear on the ballot lines of both such parties, since § 138-b does not prohibit cross-nominations of the

same candidate by two political "parties."

■ Faced with this obstacle plaintiffs have instituted this lawsuit, urging that Chapter 1179 violates § 5 of the Voting Rights Act of 1965, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment, and that if it is enforced, they will suffer irreparable injury. In considering their application we are guided by the basic principle that preliminary injunctive relief may be granted only upon a showing of likelihood of success on the merits and the existence or threat of irreparable injury. Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968).

■■ Having in mind the Supreme Court's recent admonition in Wyman v. Rothstein, 398 U.S. 275, 276, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970), to the effect that before considering constitutional issues we should resolve statutory attacks, we first take up plaintiffs' claims based upon § 5 of the Voting Rights Act of 1965, as amended by the Voting Rights Act Amendments of 1970, 42 U.S.C. § 1973c. The latter statute provides that whenever a state covered by the Act enacts any "prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968," no person shall be denied the right to vote because of a failure to comply therewith unless (1) a judgment has been entered by the United States District Court for the District of Columbia stating that the enactment does not deny the right to vote on account of race or color, or (2) the Attorney General of the United States, within 60 days after the enactment has been submitted to him, shall not have interposed an objection to it. The Supreme Court recently held that where § 5 is invoked our function is limited to determining whether the challenged law is subject to the provisions of that Act and that if we so conclude the enactment cannot become operative until it has first been approved by one of the two alternative procedures prescribed by § 5, regardless of whether we believe that the challenged provision does not discriminate on the basis of race or color. Perkins v. Matthews, 400 U.S. 379, 383, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). Having in mind that § 5 must be given the "broadest possible scope" to reach "any state enactment which altered the election law of a covered State in even a minor way," Allen v. State Board of Elections, 393 U.S. 544, 566, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969), § 138–b does appear to embody a statutory change requiring clearance under § 5, since it prescribes a standard, practice or procedure with respect to voting other than that which was in force on November 1, 1968. On that date a voter had the choice of voting for a cross-endorsed candidate either on a party line or on the line of an independent body. Chapter 1179 eliminates that choice by prohibiting such a candidate from appearing on both a party line and that of an independent group. A voter of one party, such as plaintiff Hattie Dunlap (a registered Republican) in the present case, may refuse to vote for a candidate appearing on the line of a different party (here, the Democratic Party), although willing to vote for the candidate on an independent party line. Since it is undisputed that Chapter 1179 has not been cleared through a declaratory judgment action in the District of Columbia or by submission to the Attorney General of the United States, its enforcement must be stayed.

■ Regardless of whether Chapter 1179 might be approved under the Voting Rights Act as not having a racially discriminatory effect, it represents a patent violation of the First and Fourteenth Amendments of the Constitution and hence may not in any event be enforced. As Justice Black recently pointed out in Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), one of our most precious First Amendment freedoms is "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively," 393

U.S. at 30, 89 S.Ct. at 10. See also Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1963) (per Black, J.). "Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964).

Applying these basic principles here, it is undisputed that hitherto a qualified voter in Ossining has had the opportunity to vote for a cross-endorsed candidate either on the UOP or the Democratic Party row or line and that Chapter 1179 would eliminate that opportunity by precluding such a candidate from appearing on both lines. Defendants argue that since each candidate endorsed by an independent body may well appear on one line of the ballot, giving the voter the chance to vote for him on that line, no harm is done. While this might at first blush have some appeal, we are here faced with the uncontroverted fact that some voters (e. g., Hattie Dunlap) will vote for such a cross-endorsed candidate if he is listed on one row (the UOP) but will not vote for him on another (Democratic Party). Furthermore, it was conceded on oral argument that the listing of a cross-endorsed candidate on two or more lines of a ballot represents a tangible advantage to the candidate, since it has often resulted in his gaining more votes on both lines cumulatively than he would have received if his name had appeared but once. Thus Chapter 1179 does restrict both voters and candidates.

It is equally clear that while an independent political body may be unable by itself to attract enough votes to win an election, it can exercise a decided force as the holder of the balance of power by endorsing (or refusing to endorse) a candidate nominated by a party. Chapter 1179, in addition to restricting the rights of voters and candidates, would destroy this legitimate interest of an independent body or group. The First Amendment bars such tinkering with the election process.

Even if a law prohibiting candidates from appearing on multiple lines of a ballot could escape attack under the First Amendment, the present statute, as amended, is fatally defective because of its flagrant discrimination against independent bodies and candidates nominated by such bodies. Under § 138–b, as amended, a candidate could not appear on the ballot lines of both a political "party" and "independent group." However, the statute imposes no such prohibition upon a candidate's appearing upon the ballot lines of two or more "parties." Indeed, in the last election the Republican and Conservative Parties endorsed identical candidates. Such multiple-party endorsements, particularly in municipal elections, are not unusual. The effect of the amendment, Chapter 1179, is to favor regular "party" candidates in local elections as against those endorsed by independent groups, by permitting cross-endorsements of the former but not of the latter. Absent legally sufficient justification, such invidious discrimination cannot be tolerated under the Fourteenth Amendment. See Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Williams v. Rhodes, supra; Wesberry v. Sanders, supra. As long ago as 1910 the Court of Appeals of New York invalidated a similar measure, prophetically stating:

"What exclusion could be more arbitrary than that one party or organization should not be permitted to nominate the candidate of another.

\* \* \* \* \* \*

"Would a statute which authorized a committee to nominate as its own candidate a candidate of either of the two great political parties, but not a candidate of one of the smaller parties, or authorized it to name a black-haired man, but not a red-haired man, be valid?" Matter of Callahan, 200 N.Y. 59, 61–62, 63, 93 N.E. 262, 263.

Whether we apply the standard of "compelling state interest," see Williams

v. Rhodes, *supra*, 393 U.S. at 31, 89 S.Ct. 5 or that of a "reasonable basis," for the amendment, McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), no plausible justification or rationalization has been offered in support of Chapter 1179's express discrimination against candidates of independent bodies. Although defendants have suggested that elimination of cross-endorsements of candidates nominated by independent bodies is warranted as a means of avoiding chaos and confusion in local elections, no evidence has been offered to demonstrate that such endorsements have caused confusion, much less that such confusion would differ in any respect from that which might result from cross-endorsement of candidates nominated by "parties" or named in state-wide and judicial elections, which is permitted. Absent any justification it seems more likely that Chapter 1179 was prompted by the desire of established parties to avoid or minimize the role being played by independent bodies in local elections at the expense of parties.[3]

■ In addition to showing probable success on the merits, plaintiffs have persuaded us that unless preliminary injunctive relief is granted they will suffer irreparable injury. It is readily apparent that as long as there is a prospect of Chapter 1179's being enforced, the ability of the UOP to raise campaign funds and to recruit campaign workers will be impaired. Indeed, its strength and continued existence and its ability to act as the balance of power in the coming election is seriously threatened. As against this prospect no comparable harm to defendants or others is indicated. The balance of hardship therefore tips decidedly in favor of the plaintiffs, warranting the issuance of a preliminary injunction restraining the enforcement of Chapter 1179 of the Laws of New York 1971, insofar as it would render any candidate of the UOP ineligible either to receive the nomination of a party, or vice versa, or to appear on more than one row or line on the ballot to be used in the election scheduled to be held on November 2, 1971. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969); Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968).

The foregoing shall constitute our findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

Settle order on notice.

## ON APPLICATION FOR MODIFICATION

■ By letter dated October 7, 1971, the Attorney General of the State of New York has applied for modification of our opinion filed on September 27, 1971, to the extent that it relies upon § 5 of the Voting Rights Act as amended, 42 U.S.C. § 1973c. He urges that the Act is inapplicable to this case, which arises out of an impending local election in Westchester County, for the reason that the county has not been the subject of determinations by the Attorney General of the United States that tests or devices with respect to voting were used in the past, and by the Director of the Census, pursuant to § 1973b(b), that less than 50% of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50% of the eligible voters voted in the November, 1964, or November, 1968, elections. However, it is not disputed that such determinations have been made with respect to Bronx, Kings and New York Counties.

Chapter 1179 of the Laws of New York 1971 is state-wide in its application. As we held in our opinion, § 1973c provides that such a state law is inoperative (as potentially discriminatory) until it has been approved as required thereby. Absent such approval we cannot assume that its possible discriminatory effect

---

3. Support for this conclusion is found in the fact that Chapter 1179 was introduced as a bipartisan measure without any explanation or comment, formal or otherwise, appearing in the records of the state legislature.

would be limited to political subdivisions that have been the subject of findings by the Attorney General and the Director of the Census pursuant to § 1973b(b). The latter section merely specifies a condition precedent to the operation of § 1973c.

We fail to find any convincing support for the contention that § 1973c renders a state-wide law, such as Chapter 1179, inoperative only in those political subdivisions which have been the subject of findings pursuant to § 1973b(b). Moreover, plaintiffs argue persuasively that § 1973c was never intended to be so limited since the discriminatory effect of a state-wide law would be felt in other counties of the state as well.

Accordingly, the application is denied.

It is so ordered.