341 A.2d 125

**In re Petition to Set Aside Nomination of
James F. LA VERDI, Jr.
Appeal of James F. LA VERDI, Jr.**

Supreme Court of Pennsylvania.

Submitted April 11, 1975.

Decided June 7, 1975.

Blythe H. Evans, Jr., Wilkes-Barre, for appellant.

Joseph F. Castellino, Pittston, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROB-
ERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This case requires us to determine how many signa-
tures must be obtained on a nomination petition of a can-
didate for director of a school district containing an en-
tire city. We conclude that, under the provisions of sec-
tion 912 of the Election Code,[1] candidates from such dis-

---

1. Act of June 3, 1937, P.L. 1333, art. IX, § 912, as amended, 25 P.
   S. § 2872 (1963). This section provides:
   "(a) If for the office of President of the United States, or of
   United States Senator, by at least one hundred registered and
   enrolled members of the proper party on each of at least ten
   counties of the State.
   "(b) If for a State office to be filled by a vote of the electors
   of the State at large, for the office of delegate or alternate del-
   egate at large to a National party convention, or for the office
   of member of the National committee, by at least one hundred
   registered and enrolled members of the proper party in each of
   at least five counties of the State.
   "(c) If for the office of Representative in Congress, or of del-
   egate or alternate delegate to a National party convention, oth-
   er than delegate or alternate delegate at large, or of judge of
   any court of record other than a court whose judges are to be
   elected by a vote of the electors of the State at large, or of
   State senator, or of any municipal office to be filled by a vote
   of the electors of a senatorial district, by at least two hundred
   registered and enrolled members of the proper party: Provided,
   That associate judges of any court of record unlearned in the

tricts, like all other candidates for an "office to be voted for by the electors of an entire city," must obtain 100 valid signatures to secure a place on the ballot.

On March 10, 1975, appellant James La Verdi, Jr., filed a nomination petition to have his name placed on the Republican Party primary ballot as a candidate for the office of School Director of the Pittstown Area School District. The petition, which was submitted on the standard form with spaces for 112 names, contained 106 signatures. Five days later, appellees, all candidates for either the Democratic or Republican nomination for school director, filed a petition in the Luzerne County Court of Common Pleas alleging that nine of the signatures on appellant's petition were invalid and seeking to have the nomination petition set aside because it contained fewer than 100 valid signatures.[2]

On March 21, 1975, the court held a hearing on appellees' petition. At the hearing, appellant did not dispute that he had fewer than 100 valid signatures on his petition; he instead contended that under section 912 only ten signatures were required. Six days later, the court filed an opinion and order holding that 100 signatures were required on the petition and therefore setting aside ap-

> law shall be required to have at least one hundred registered and enrolled members of the proper party.
>
> "(d) If for the office of Representative in the General Assembly, or for the office of member of the State committee, or an office to be voted for by the electors of the entire county, or an office to be voted for by the electors of an entire city, or for the office of district councilman in a city of the first class, by at least one hundred registered and enrolled members of the proper party, except for the office of magistrate in cities of the first class, in which case it must be signed by at least three thousand registered and enrolled members of the proper party.
>
> "(e) If for the office of inspector of election, by at least five registered and enrolled members of the proper party.
>
> "(f) And for all other offices and all other party offices, by at least ten registered and enrolled members of the proper party."

2. See Election Code § 977, as amended, 25 P.S. § 2937 (Pa.Leg. Serv. 770 (1974)).

pellant's petition. Appellant filed post-hearing motions which were apparently denied. This appeal ensued.[3] Because of the need for expeditious decision in this appeal, having reached our resolution of the issue, we filed an order on April 28, 1975, affirming the order of the hearing court and noting that opinions would follow.

## I.

Resolution of this appeal required interpretation of section 912(d) which provides:

"If for the office of Representative in the General Assembly, or for the office of member of the State committee, or an office to be voted for by the electors of the entire county, or an office to be voted for by the electors of an entire city, or for the office of district councilman in a city of the first class, by at least one hundred registered and enrolled members of the proper party, except for the office of magistrate in cities of the first class, in which case it must be signed by at least three thousand registered and enrolled members of the proper party."

Election Code § 912(d) 25 P.S. § 2872 (1963).

The Pittstown Area School District embraces a geographical area which includes the entire city of Pittstown as well as surrounding communities. The court of common pleas concluded that, because school directors of this district are voted for by the electors of the entire city of Pittstown, the number of signatures required was 100 as provided under subsection (d). Appellant, however, contends that school directors are not specifically mentioned in section 912, and that therefore nominations for that office fall into the residuary clause, subsection (f),[4] and that only 10 signatures are required.

3. See Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(2), 17 P.S. § 211.202(2) (Supp.1974).

4. See note 1 supra.

■ Section 912 (d) is a legislative mandate that candidates seeking nomination for an office elected by the voters of "an entire city" demonstrate a showing of support for their candidacy by obtaining 100 valid signatures of qualified voters before they are given a place on the primary ballot. It follows that where a governmental unit contains not only "an entire city" but additional areas as well, as in the present case, a candidate seeking an office elected by the voters of that unit must likewise obtain 100 signatures on his petition.

■ Appellant, however, argues that school directors were not intended to come within the terms of subsection (d) at all, regardless of the nature of the political unit whose voters elect them. This proposed construction distorts the intent of the Legislature clearly expressed in the Election Code. The definitional section of the Code provides:

"The words 'public office' shall included every public office to be filled by sons can be elected by a vote of the electors under the laws of this State."

Election Code § 102(s), 25 P.S. § 2602(s) (1963). Thus when the Legislature spoke in section 912(d) of "an office to be voted for by the electors of an entire city," it included every public office to be filled by the voters of that governmental unit.

■ That section 912 (d) makes no mention of school directors has, of course, no bearing on this issue. Subsection (d) also makes no reference to mayors, city councilmen, or any other official elected by the voters of a city. However, these offices, because they are "voted for by the electors of an entire city," are subject to the 100 signature requirement of subsection (d). The same reasoning leads us to conclude that school directors of districts containing "an entire city" are also subject to the requirements of subsection (d).

We have previously recognized that "the avoidance of a cluttered ballot and the possible necessity of using paper ballots rather than voting machines [is] a legitimate and reasonable goal of public policy." *Shankey v. Staisey,* 436 Pa. 65, 71, 257 A.2d 897, 899–900 (1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 684, 24 L.Ed.2d 682 (1970). By placing a reasonable limitation upon access to a position on the ballot, the Legislature attempted to provide the voter with an understandable ballot and to assure that the qualifications and public support of a candidate, and not the position of his name on the ballot, would be the most important factor in the success or failure of a candidate.

The Supreme Court of the United States has recognized the importance of this policy:

"A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence tend to impede the electoral process. . . .

"That 'laundry list' ballots discourage voter participation and confuse and frustrate those who do participate is too obvious to call for extended discussion. . . . Rational results within the framework of our system are not likely to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects of success."

*Lubin v. Panish,* 415 U.S. 709, 715, 94 S.Ct. 1315, 1319–20, 39 L.Ed.2d 702 (1974).

"There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception,

and even frustration of the democratic process at the general election."

*Jenness v. Forts,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).

All the reasons that led the Legislature to conclude that effectuating this policy of providing the voter with an understandable ballot required that, where the voters of an entire city are to elect an official, candidates must acquire 100 signatures apply equally to city officials and school directors. School directors have taxing powers equal to, if not greater than, those of city councilmen; their educational duties are as vital to the well-being of the community as are the governmental responsibilities of elected city officials. It is therefore highly improbable that the Legislature intended that candidates for school director could obtain a place on the ballot with only one-tenth the signatures required of candidates for the offices of a city included within the school district. We therefore hold that the court of common pleas correctly determined that appellant's petition must be set aside for failure to secure the required 100 signatures.

This holding is in accord with a long-standing interpretation of this section. Over 35 years ago, the Luzerne County Court of Common Pleas held that a candidate for director of a school district which contains an entire city must obtain 100 signatures on his nomination petition.[5]

5.  *Conway v. Luzerne County Election Board,* 34 Luz.L.Rev. 106 (C.P.1939):

    "Petitioner filed with the Luzerne County Election Board a nomination petition to have his name printed on the official ballot as a candidate for the office of school director of the city of Wilkes-Barre. This petition contained the names of only fifteen qualified electors of said city and was rejected by said board because it did not comply with Section 912(d) of the Election Code . . . .

    "There is no dispute that this petitioner seeks to be a candidate for an office which is to be voted for by the electors of the entire city of Wilkes-Barre and, by the foregoing section of this petition, to be valid, must contain signatures of at least one hundred enrolled members of his party. Without the re-

In all the reports of cases decided from the date of that decision until this case, we have found not a single challenge to the validity of that holding. This too is the view adopted by the Commonwealth agency entrusted with supervision of the electoral process.[6] Indeed, the fact appellant used the petition form with spaces for 112 names and gathered 106 signatures suggests that even he understood that at least 100 signatures were required. It was only when it was determined that he had fewer than 100 valid signatures that he contended only 10 were required.

## II.

█ Appellant argues that the construction of the statute which we have adopted violates the equal protection clause of the fourteenth amendment of the United States Constitution because it impermissibly discriminates between candidates for school director running in districts containing "an entire city" and those running in districts that do not. We cannot agree.

█ We have previously held that differing requirements for a position on the ballot will withstand an equal

quired number of signatures, said petition is void and this Court is without power to compel the election board to accept it.

"Petitioner contends that the aforesaid section does not apply to school directors because they are not municipal officers and cites authority therefor. Counsel for respondents does not deny that that is the law, but properly contends that it has no bearing on this case because the requirement of one hundred signatures is not a prerequisite for municipal officers alone but applies to all candidates seeking an office to be voted for by the electors of an entire city. To grant this writ of mandamus against the respondents, the Court would be in the anomalous position of directing the election board to do that which the Legislature has definitely and specifically precluded it from doing, that is accepting a petition with less than the required number of signatures."

6. See Memorandum from Louis G. Mete, Commissioner of Elections, Commissions and Legislation, to all County Boards of Election, January 30, 1974. (For the source of the Commissioner's authority, see Election Code § 201, 25 P.S. § 2621 (1963)).

protection challenge if the difference is rationally related to a difference in the nature of the constituencies served by the offices sought. *Shankey v. Staisey,* supra, at 72, 257 A.2d at 900.[7]

In the present case, the legislative classification rests on the General Assembly's recognition that cities generally have larger and denser populations than do townships and boroughs. And while it is not invariably true that school districts containing cities are more populous than those that do not, the Legislature, could reasonably have concluded that, due to the demographic characteristics of cities, 100 signatures were reasonable and necessary to avoid cluttered ballots in school districts containing cities. The Legislature could also have concluded that in the less densely populated districts without cities, the objective of assuring manageable ballots could be achieved without requiring 100 signatures. It is not for the courts to pass on the wisdom of this reasoning. Our sole task is to conclude whether the classification is rational and therefore meets the standards of the equal

---

**7.** The Supreme Court of the United States has held that substantial burdens on access to a place on the ballot are constitutionally suspect under the first amendment as restrictions on the right to vote and to associate for political purposes and hence invalid unless necessary to serve a compelling state interest. *American Party v. White,* 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). See also *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

The Supreme Court has strictly scrutinized classifications created by state regulation of access to the ballot under the equal protection clause only in cases in which the classification "invidiously" discriminates by giving an advantage to one party or candidate over opponents or by giving in the same election greater access to the ballot to one class of citizens than others. See *Lubin v. Panish,* 414 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *American Party v. White,* supra; *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

The rationale for applying the "strict scrutiny" test in those cases does not apply where the legislative classification is based on the office sought or the constituency to be represented. We therefore conclude that the "rationale relationship" test is the proper one to be applied in this case.

protection clause. Failing to find the constitutional deficiency which appellant asserts, the statute must be upheld and the order below affirmed.[8]

Order affirmed.

MANDERINO, J., filed a dissenting opinion in which EAGEN and POMEROY, JJ., join.

MANDERINO, Justice (dissenting).

I dissent. While undoubtedly true, as the majority opinion points out, that the state has a legitimate interest in regulating the number of names appearing on the ballot and in assuring that those who appear enjoy a "significant modicum" of support, *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554, 562 (1971), "[t]he Election Code must be liberally construed so as not to deprive an individual of his right to run for office, or the voters of their right to elect a candidate of their choice." *Nomination Petition of Ross*, 411 Pa. 45, 48, 190 A.2d 719, 720 (1963). My reading of the statute as a whole compels the conclusion that the number of signatures required for a position on the ballot for the office of School Director is controlled by subsection (f) of Section 912 of the Election Code. If subsections (d) and (f) are read in the context of the entire section, it is clear that subsection (d) was not meant to include an office to be voted for by the *electors of an entire school district*.

---

8. Appellant also challenges this provision as a violation of Pa. Const. art. III, § 7, P.S. That section provides:
   "No local or special bill shall be passed unless notice of the intention to apply therefor shall have been published in the locality where the matter or the thing to be effected may be situated, which notice shall be at least thirty days prior to the introduction into the General Assembly of such bill and in the manner to be provided by law; the evidence of such notice having been published, shall be exhibited in the General Assembly, before such act shall be passed."
   We find this contention to be totally without merit.

The drafting scheme of the entire section is clear. It first covers an office to be filled "by a vote of the electors of the state at large, . . . ." It then refers to offices to be filled by electors of a senatorial district. Later, it speaks of an office to be voted for by the electors of an entire county, and then makes reference to an office to be elected by the electors of an entire city. *In those cases where offices customarily may cover more than one municipality, or portions of municipalities, the section makes specific reference by naming the office.* This is done in the case of a Representative in Congress, delegate or alternate delegate to a National party convention, State senator, Representative in the General Assembly, and member of a State committee. These are offices which may include portions of various municipalities within the area they cover, or which may include within their area all of a single municipality. Unlike these specifically named offices, the office of School Director is not mentioned in this section. When read in this context, the phrase "an office to be voted for by the electors of an entire city . . . ." refers to offices of that city only, and not to offices to be voted for by the *electors of an entire school district.* Strictly speaking, a school director is elected by the voters of an entire school district, not those of a county or of a city. It may be that by geographical accident the area covered by the school district could be coterminous with the area of a certain city or county, but it is still the *electors of the school district,* not those of the city or county, who vote for its directors.

In Section 912, three different descriptions are used when referring to electors. The section sometimes refers to *electors of an entire city,* it sometimes refers to *electors of an entire county,* and it sometimes refers to *electors of the state.* In the context of the entire section, it is clear that the *same elector* is described in three different ways indicating that three different meanings were

intended depending upon whether the nomination petition is for a city office, a county office, or a state office. Thus, the legislature was clearly not referring only to the residency of the electors, but was referring to the kind of office—a city office—to be voted for by the electors when it used the phrase, "electors of an entire city."

The scheme of the section is not necessarily one which increases the number of signatures required on a nominating petition as the geographical area or population increases. Subsection (c), for instance, requires 200 signatures for a representative in Congress, and the same number of signatures for a State Senator, even though a congressional district is greater in population, and in some situations larger in area, than a senatorial district. Subsection (d) requires 100 signatures for an office to be voted for by the *electors of an entire county* and the same number of signatures for an office to be voted for by the *electors of an entire city*. In all situations in ,Pennsylvania, except Philadelphia, *an entire county* is larger both in geographical area and in population than *an entire city* located in that county. Yet, 100 signatures are required in both cases. I am therefore unable to perceive any scheme in the section establishing a direct ratio between required signatures and either geographical area or population.

The legislature has expressly recognized the existence of the office of school director in at least one other section of the Election Code. The legislature has provided that the board of elections of each county shall ascertain the various public offices to be filled "in said county and in the cities, boroughs, towns, townships, wards, *school districts*, poor districts and election districts thereof . . . ." (Emphasis added.) 25 P.S. 2863. Had the legislature intended that the number of signatures needed on a petition for the office of School Director— an office whose geographical area often encompasses portions of more than one municipality—be controlled by

subsection (d), it could easily have specified in subsection (d) that such a requirement applies to the office of School Director. Since none of the subsections refer to the office of School Director, that office falls to the catch-all provisions of subsection (f).

To interpret as the majority does means that, in some school districts, only ten signatures are required by subsection (f), but in other school districts, one hundred signatures are required by subsection (d). Had the legislature intended that a different number of signatures be required on nominating petitions for the offices of School Director of various districts depending upon whether the school district included an entire city within its geographical area, it could have so specified. In the absence of such an express requirement, I am unable to so interpret the Act. To do so unduly restricts access to the ballot of one seeking the office of School Director, and is therefore contrary to the philosophy expressed in *Nomination Petition of Ross*, 411 Pa. 45, 190 A.2d 719 (1963).

Mr. Justice EAGEN and Mr. Justice POMEROY join in this dissenting opinion.